**E-FILED**
Monday, 09 September, 2013  12:56:09 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 12-20008 |
| ) | |
| NOE SANCHEZ a.k.a. ) | |
| EPIMENIO SANCHEZ GONZALES ) | |
| and MANUEL GONZALEZ, ) | |
| ) | |
| Defendants. ) | |

## OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

This cause is before the Court on Defendant Manuel Gonzalez's Motion to Suppress Statements (d/e 47).  Defendant's Motion is DENIED.  The Government has demonstrated that Defendant knowingly, voluntarily, and intelligently waived his rights under Miranda.  Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).  Moreover, Agent Russ Belcher did not unconstitutionally induce Defendant Gonzalez's incriminating statements.

## I.  BACKGROUND

Defendant Gonzalez and his uncle, co-defendant Noe Sanchez, a.k.a. Epimenio Sanchez Gonzales, have been indicted on charges of conspiring to manufacture and distribute marijuana, possession with intent to distribute marijuana, unlawful possession of a firearm by an illegal alien, and possession of a firearm in furtherance of a drug-trafficking crime.  Co-defendant Sanchez has also been charged with illegal re-entry into the United States following deportation.

On September 22, 2011, agents with the Kankakee County Major Crimes Task Force patrolled the area of 7752 South 17000 East Road, St. Anne, Illinois.  Authorities had received an anonymous tip regarding marijuana plants being grown in the area.  Agents Russ Belcher and Andy Mackin were greeted by Defendant at the address.

The Agents advised Defendant that they were looking for marijuana plants.  Defendant consented to the Agents searching the property.  Next to a shed that appeared to be the living quarters of Gonzalez and co-defendant Sanchez, the Agents saw one marijuana plant.  Approximately 50 to 75 yards from the shed, the Agents observed

numerous manmade, evenly spaced, rows of marijuana plants.  The

plants had yellow plastic flowers attached to them.  In all, the Agents

recovered 2,253 marijuana plants from the field and located a loaded

Browning BPS 10 gauge shotgun in the shed.  At the scene, Defendants

denied having any knowledge about the marijuana crop.

A.   **Defendant Gonzalez Stated that He and Co-defendant Sanchez Took Care of the Marijuana Field in St. Anne, Illinois**

Agent Belcher began the interview with Defendant, a Mexican

National and 22 years old at the time, by apologizing for making

Defendant wait.  Agent Belcher said to Defendant, "These other

interviews have been taking some time, getting a lot of information from

them . . . ."  See d/e 39 at 1.  Agent Belcher then asked Defendant

booking questions such as Defendant's name, age, address, phone

number, education history, and whether Defendant could read English.

Defendant spelled his name orally, told Agent Belcher he was 22 years

old, stated his current address in Kankakee, Illinois, told Agent Belcher

he stayed at the property in St. Anne, Illinois once or twice per week, and

gave Agent Belcher his phone number.  Defendant also told Agent

Belcher that he had completed twelve years of schooling in Mexico and

that he could read English.

Agent Belcher then read the Kankakee County Sheriff's Police

Video/Audio Recorded Interview Consent form as follows:

S/A Belcher:  So, I'm gonna read this out loud.  You can read it
to yourself as I go but make sure if you have a
question, ask me when I'm done talking or just
stop me when you have a question.  And I'll make
sure you understand this ok?  Let's go over well so
here's what this is.  It's side one, it's Kankakee
County Sheriff's Police video and audio recorded
interview consent form.  Today's date, September
22, 2011.  You're at the Kankakee County Sheriff's
Department of Investigations.  It's 6:17 p.m.  I,
Manuel Gonzalez, am 22 years old.  My date of
birth is 10-29-88.  I live at 7752 South 17000 East
Road in Saint Anne, Illinois once or twice a night,
just kinda what we figured, throughout the week
but you're there throughout the week working
correct?

Gonzalez:     Yeah.

S/A Belcher:  So, your other place you live is on South Skylar
but we're not sure the exact address.  Your phone
number is 707-536-7055.  The person to whom I
give this voluntary statement is Russell Belcher,
having identified himself, myself, as a Kankakee
County Sheriff's Deputy.  Duly warned and
advised me that I know that this interview is being
recorded and I voluntarily consent and agree to an
audio/video tape recording of this interview.  If you

do so, initial there and sign there please.  Do you understand what this is?

Gonzalez:      (Shakes head affirmative).

S/A Belcher:  Ok.  And I'm gonna sign as a witness down at the bottom.

See d/e 39 at 3-4.

Immediately after this exchange with Defendant, Agent Belcher read the Kankakee County Sheriff's Police Voluntary Statement form to Defendant.

S/A Belcher:   And this second set.  Once again, Kankakee County Sheriff's Police.  It's a voluntary statement form.  Today's date, September 22, 2011 at Kankakee County Sheriff's Department up in Investigations.  The time right now is 6:17 p.m.  I, Manuel Gonzalez, am 22 years old, my date of birth is 10/29/88.  I live at 7752 South 17000 East Road in Saint Anne, Illinois.  My telephone number is 707-536-7055.  The person to whom I give the following voluntary statement, Russell Belcher, having identified and made myself known as a Kankakee County Sheriff's Deputy, duly warned and advised me and I know that I have the right to remain silent and not make any statement at all nor incriminate myself in any manner whatsoever.  If you understand what that right is, initial at number one please.  Do you have any questions on that?

Gonzalez:      No (shakes head).

S/A Belcher:    Ok.  Number two, that anything I say can and will be used against me in a court or courts of law for the offense or offenses concerning which this statement is herein made.  Do you understand that right?

Gonzalez:       (Shakes head in affirmative).

S/A Belcher:    Just initial at the number two please.  Number three, that I can hire a lawyer of my own choice to be present and advise me before and during this statement.  If you understand that, initial on three as well please.  Number four, if I am unable to hire a lawyer, I can request and receive appointment of the lawyer by proper authority, without cost or charge to me to be present and advise me before and during this statement.  If you understand that initial four please.  Once again, sign on the bottom.

See d/e 39 at 4-6.  Defendant acknowledged after each warning that he understood his rights.  Defendant also initialed a line next to each warning to indicate he understood his rights and signed the bottom of the Voluntary Statement form.

After the warnings were given, Agent Belcher asked Defendant about the marijuana found at the property in St. Anne, Illinois and the shotgun recovered from that property stating:

S/A Belcher:    Tell me in your words, why do you think you're up here?  Wrong or right.  I mean I'll tell you in a

minute but I just want to see what you're thinking.  Probably we found something out there right?

Gonzalez:  Yeah.

S/A Belcher:  Did somebody tell you we found some weed or something?  Cannabis, marijuana, it's all the same thing.  I'll just call it weed.

Gonzalez:  Yeah.

S/A Belcher:  That's what I call it.  So, there was some weed found out there.  When I got there, and I forgot who I spoke with but I believe it was you, when I first got there.  You came out of the gate and I told you, hey, there's even a plant that we picked out of the yard by the horses or whatever.  Did you ever know those were there?

Gonzalez:  (Unintelligible) No.

S/A Belcher:  There's wild weed that grows all over Hopkins.

Gonzalez:  Yeah.

S/A Belcher:  We picked those and I said hey we had information that there was some in the back right?  You remember me telling you that?

Gonzalez:  Yeah.

S/A Belcher:  And then did I ask you if I could go back there?

Gonzalez:  (Shakes head affirmative).

S/A Belcher:    And you didn't have a problem with it?

Gonzalez:       No.

S/A Belcher:    And then, eventually I go back there and we see a little bit of weed, so then I go over and I talk to you and I told you guys that some other cars are gonna be coming, because we were gonna take it all.  And, I asked if you didn't mind to open the gate down there and uh, what's your uncle's name?

Gonzalez:       Noe.

S/A Belcher:    Noe.  I asked him, I think he volunteered to go down and open it.  So, we just kinda sit and we bullshit for a little bit about different things.  So, eventually, some other cars show up, some deputies, a county deputy, a couple of them, and I asked if, at one point I asked if you guys had anything on you, if I could search you guys.  Did you have a problem with me searching you?

Gonzalez:       No.

S/A Belcher:    Because you didn't have anything on you right?

Gonzalez:       No.

S/A Belcher:    And I asked for our safety, since we were gonna be out there for a while, if there was like a firearm.  I don't remember who I asked but, you remember?

Gonzalez:       Both.

S/A Belcher:    Was I asking you . . . ?

Gonzalez:      Both.

S/A Belcher:   Both.  Yeah we got one, you're in the middle of the woods, everybody's gonna have them.  So, where, you said it was where at?

Gonzalez:      In the shed.

S/A Belcher:   In the shed?

Gonzalez:      Yeah.

S/A Belcher:   And that's kinda where you live? 'Cuz you made the living quarters out of it right?  So, did you at one point I asked if it was okay if we could search it.  Do you remember if you consented to that, said ok - - it's ok?

Gonzalez:      Yeah I did.

S/A Belcher:   It wasn't a problem?

Gonzalez:      No.

                              * * * *

S/A Belcher:   Then we asked you guys to come down here and we were gonna talk with you.  So, it's been a little while so I apologize for the wait.  And then talking with them - - took a little time as well because we were going over a lot of details, making sure we had, we were both on the same page and that we were both honest with each other.  And that's what's gonna matter right now.  Keeping it honest, it's gonna save a lot of time talking about the lies.

> Don't think you're in a world of shit because you're not man.  You guys, you didn't have that shit that was back there in your shed, it's not with you.  So you're not in possession with it in your shed right (unintelligible), you know what I mean?

See d/e 39 at 6-10.

Later in the interview, Defendant stated that he and his uncle, co-defendant Sanchez, began growing marijuana at the St. Anne, Illinois address approximately 4 to 5 months before September 22, 2011.  See d/e 39 at 12.  Defendant explained how he and co-defendant Sanchez had put fertilizer on the plants and how, after about one month, they tied plastic flowers to the plants to avoid aerial detection.  See d/e 39 at 13-14.  Defendant then explained that in about one month the plants would be harvested, dried, and packaged for sale.  See d/e 39 at 15-17.  Defendant thought the field would yield 100 or more pounds of marijuana and that the marijuana could be sold for $1,500 per pound.  See d/e 39 at 18-19.  Defendant also stated that he and co-defendant Sanchez took the shotgun with them into the field.  See d/e 39 at 23-24.

Defendant has filed a Motion to Suppress (d/e 47) his statements arguing that he did not knowingly, intelligently, and voluntarily waive his

rights under Miranda.  Defendant also contends that Agent Belcher

induced Defendant to make involuntary statements.

## II.   ANALYSIS

A.   **Defendant Gonzalez Knowingly, Intelligently, and Voluntarily Waived His Rights Under Miranda**

Defendant argues first that his statements should be suppressed

because Agent Belcher used diversionary tactics and administered

misleading Miranda warnings.  Defendant argues that the diversionary

tactics and misleading warnings meant that he did not knowingly,

intelligently, and voluntarily waive his rights under Miranda.  Defendant

further asserts that he never expressly waived his rights under Miranda.

The Fifth Amendment of the United States Constitution provides

that no person "shall be compelled in any criminal case to be a witness

against himself."  U.S. Const. amend. V.  In Miranda, the Supreme

Court concluded that, without proper safeguards, the process of in-

custody interrogation of persons suspected or accused of a crime contains

inherently compelling pressures which work to undermine the

individual's will to resist and to compel him to speak where he would not

otherwise do so freely.  Miranda, 384 U.S. at 469.  Consequently, the

Court formulated the <u>Miranda</u> warnings to assure that the individual's

right to choose between silence and speech remains intact throughout the

interrogation process.  <u>Id.</u>  Therefore, before custodial interrogation,

police must warn an individual of his right to remain silent, that any

statement he does make may be used as evidence against him, and that

he has the right to presence of an attorney, retained or appointed.  <u>Id.</u> at

444.

A valid <u>Miranda</u> waiver must be intelligent, knowing, and

voluntary.  <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 130 S.Ct. 2250, 176

L.Ed.2d 1098 (2010).  Specifically, the waiver must have been "the

product of a free and deliberate choice rather than intimidation,

coercion, or deception," and the "totality of the circumstances

surrounding the interrogation" must show that the defendant had "a full

awareness of both the nature of the right being abandoned and the

consequences of the decision to abandon it."  <u>Moran v. Burbine</u>, 475

U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), <u>accord</u>,

<u>Colorado v. Spring</u>, 479 U.S. 564, 573-74, 107 S.Ct. 851, 93 L.Ed.2d

954 (1987).  The burden is on the Government to demonstrate by a

preponderance of the evidence that the individual knowingly, voluntarily, and intelligently waived his rights under <u>Miranda</u>.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

> 1. **Administering the Video/Audio Recorded Interview Consent Form Was Not a Diversionary Tactic and the <u>Miranda</u> Warnings Administered By Agent Belcher Gave Defendant Proper Notice of His Rights Under <u>Miranda</u>**

In this case, Defendant first initialed and then signed the Kankakee County Sheriff's Police Video/Audio Recorded Interview Consent form. This form was read to Defendant by Agent Belcher after Defendant indicated that he understands English and states that "The person to whom I give this voluntary statement is Russell Belcher, having identified himself/herself as a Kankakee County Sheriff's Deputy, DULY WARNED AND ADVISED ME, AND I KNOW THAT THIS INTERVIEW IS BEING RECORDED AND: I voluntarily consent and agree to an audio/videotape recording of this interview."  <u>See</u> d/e 47 at 18.  Under the signature line, the Video/Audio Recorded Interview Consent form states "Signature of person giving voluntary statement." <u>See</u> d/e 47 at 18.

Next, Agent Belcher read the Kankakee County Sheriff's Police
Voluntary Statement form to Defendant.  Defendant initialed the form
after Agent Belcher read each <u>Miranda</u> warning.  Defendant also signed
the form at the bottom.  The form appears as follows:

> The person to whom I give the following voluntary statement,
> Russell Belcher, having identified and made himself known as
> a Kankakee County Sheriff's Deputy,
>
> DULY WARNED AND ADVISED ME, AND I KNOW:
>
> 1. That I have the right to remain silent and not make any
> statement at all, nor incriminate myself in any manner
> whatsoever.
>
> 2.  That anything I say can and will be used against me in a
> court or courts of law for the offense or offenses concerning
> which this statement is herein made.
>
> 3.  That I can hire a lawyer of my own choice to be present
> and advise me before and during this statement.
>
> 4.  That if I am unable to hire a lawyer I can request and
> receive appointment of a lawyer by the proper authority, with
> out cost or charge to me, to be present and advise me before
> and during this statement.

<u>See</u> d/e 47 at 19.

Defendant notes that the Video/Audio Recorded Interview Consent
form refers to a "voluntary statement" three times.  Defendant also notes

that Video/Audio Recorded Interview Consent form was read to him

before receiving any <u>Miranda</u> warnings, and, therefore, Defendant argues,

was a diversionary tactic to make Defendant believe he had committed to

making a voluntary statement in the Video/Audio Recorded Interview

Consent form.  This, contends Defendant, "dilute[d] and frustrate[d] the

purpose of the <u>Miranda</u> warnings so that [Defendant's] alleged waiver of

his <u>Miranda</u> rights was not made voluntarily, knowingly, and

intelligently."  <u>See</u> d/e 47 at 6.

Defendant also asserts that the <u>Miranda</u> warnings were "inaccurate,

misleading, and confusing because the title of the [<u>Miranda</u>] form refers

to a voluntary statement and each warning refers to a statement to be

made by the person being warned rather than questioning by the police."

<u>See</u> d/e 47 at 7.  Moreover, Defendant asserts, "the warnings make a

nearly incomprehensible reference to 'anything I say can and will be used

against me in a court or courts of law for the offense or offenses

concerning which the statement is herein made.'"  <u>See</u> d/e 47 at 8.

Defendant contends that "[b]y the terms of this warning only statements

[Defendant] ma[de] about offenses he committed [could] be used against him."  See d/e 47 at 8.

To support the claim that ineffective warnings and diversionary police tactics prevented Defendant from making a knowing, intelligent, and voluntary waiver of his rights under Miranda, Defendant cites United States v. Wysinger where the agent told the defendant he could talk to a lawyer for advice before any questions or during the questioning.  683 F.3d 784, 797 (7th Cir. 2012) (emphasis added).  The Seventh Circuit stated that the agent should have informed the defendant that he had a right to talk with an attorney before and during questioning.  Id. at 799 (emphasis added).  The Seventh Circuit then noted that after giving this "potentially" inadequate Miranda warning, the agent magnified the error by implying that questioning had not begun and by narrowing the defendant's choices to cooperating or being charged with conspiracy rather than telling the defendant he could remain silent.  Id. at 803.

The Seventh Circuit found the defendant's statements inadmissible in Wysinger "because [the Miranda warning] erroneously suggested that

[the defendant] had to choose between having a lawyer present before questioning or during questioning" rather than before and during questioning and "because the agents used various tactics to confuse [the defendant] regarding the start of 'questioning' and to divert him from exercising his rights . . . ." Id. The Seventh Circuit further noted that the agent had used these tactics even after the defendant had said he wanted a lawyer. Id.

Wysinger, however, is inapposite. Here, Defendant received all of the appropriate Miranda warnings including that "anything I say can and will be used against me in a court or courts of law for the offense or offenses concerning which this statement is herein made." See d/e 47 at 19. This admonition, even though not a talismanic incantation of the warning as set forth in Miranda, put Defendant on notice of his right against self-incrimination, the consequences of foregoing that right, and that he was not in the presence of persons acting solely in his interest. See Florida v. Powell, 559 U.S. 50, 62, 130 S.Ct. 1195, 175 L.Ed.2d 1009 (2010) (stating that Miranda warnings do not require specific language and then finding that warnings stating that the suspect had "the

right to talk to a lawyer before answering any of [the officers']

questions," and "the right to use any of [his] rights at any time [he]

want[ed] during th[e] interview," reasonably conveyed to the suspect

that the right to counsel applied before and during interrogation).  This is

all <u>Miranda</u> requires.

Moreover, after Defendant indicated he can understand English,

Agent Belcher read the Video/Audio Recorded Interview Consent form

that contains three references to Defendant making a voluntary

statement.  The phrase "voluntary statement" in the Consent form

plainly refers to Defendant Gonzalez voluntarily consenting to having

had his interview video recorded.

After reading the Video/Audio Recorded Interview Consent form,

Agent Belcher read Defendant the <u>Miranda</u> warnings one-by-one from

the form entitled Kankakee County Sheriff's Police Voluntary Statement.

After reading each right, Agent Belcher asked if Defendant understood.

Each time, Defendant answered yes and initialed a line next to the

warning thereby expressing that he in fact understood what Agent

Belcher had read.

The record demonstrates that the Video/Audio Recorded Interview Consent form plainly states that Defendant was voluntarily agreeing to a recorded interview with authorities and nothing more.  Further, Defendant's understanding of his rights under <u>Miranda</u> dispels any fear that Defendant felt obligated to speak with Agent Belcher because of the references to a voluntary statement in the Video/Audio Recorded Interview Consent form.  Therefore, the record establishes that Agent Belcher did not use diversionary tactics or administer inaccurate <u>Miranda</u> warnings that would have prevented Defendant from knowingly, intelligently, and voluntarily waiving his rights under <u>Miranda</u>.

### 2.   Defendant Waived His Rights Under <u>Miranda</u> By Making Uncoerced Statements After Receiving the <u>Miranda</u> Warnings

Defendant argues further that Agent Belcher never obtained a waiver of Defendant's rights under <u>Miranda</u> when Defendant signed the bottom of the Voluntary Statement form.  Instead, Defendant contends, Agent Belcher merely told Defendant to "once again sign at the bottom" as Defendant had done on the Video/Audio Recorded Interview Consent form.  <u>See</u> d/e 39 at 6.  Defendant asserts that "[r]ather than constitute an express waiver this duplicitous signature line and [Agent] Belcher's

direction to, 'once again sign the bottom' simply serves as a reminder that [Defendant] had already committed to giving a 'voluntary statement'" by signing the Video/Audio Recorded Interview Consent form.  <u>See</u> d/e 47 at 12.

However, even if Defendant Gonzalez did not expressly waive his rights under <u>Miranda</u>, a suspect who has received and understood the <u>Miranda</u> warnings, and has not invoked his rights under <u>Miranda</u>, impliedly waives the right to remain silent by making an uncoerced statement to the police.  <u>See</u> <u>Thompkins</u>, 130 S.Ct. at 2264 (finding that the defendant waived his rights under <u>Miranda</u> by responding to the officer's question even though the defendant had remained silent during almost three hours of questioning).

Defendant never invoked his right to remain silent after receiving and understanding the <u>Miranda</u> warnings.  Therefore, Defendant's uncoerced statements almost immediately after receipt of the <u>Miranda</u> warnings constitute an implied waiver of the right to remain silent even if Defendant's signature at the bottom of the Voluntary Statement form was not an express waiver of his rights under <u>Miranda</u>.

B.   Agent Belcher Did Not Make Assurances to Defendant Gonzalez
that Induced Defendant to Make Involuntary Statements

Defendant also argues that Agent Belcher's fraudulent assurances

and promises to Gonzalez that he was not facing criminal liability

unconstitutionally induced Defendant to make involuntary statements.

Specifically, Defendant notes that Agent Belcher began the interview by

stating that he had interviewed others and received a lot of information

"but, just like all theirs, I'm going to read [the Video/Audio Recorded

Interview Consent form and Voluntary Statement form] to you, because

its our policy for the department for what we do before we talk to

anybody, and while we're talking to them."  See d/e 39 at 1.  Agent

Belcher then assured Defendant that "There's wild weed that grows all

over Hopkins," and stated "Don't think you are in a world of shit

because you're not man.  You guys, you didn't have that shit that was

back there in your shed, its not with you.  So you're not in possession

with it in your shed right (unintelligible), you know what I mean."  See

d/e 39 at 7, 10.  Further, when Agent Belcher spoke about the shotgun in

the shed he stated that the officers asked about the gun for safety reasons

and that "you're in the middle of the woods, everybody's gonna have

them." See d/e 39 at 8.  Defendant contends that Agent Belcher made these comments to make Defendant believe he was not a target of the investigation, and, therefore, Agent Belcher induced Defendant's involuntary statements.

A confession is involuntary if the confession is a result of coercive police conduct.  United States v. Montgomery, 555 F.3d 623, 631-32 (7th Cir. 2009).  The use of deceit to obtain a confession does not render the confession involuntary as long as the police interrogation was not coercive.  Id.  Courts determine whether police conduct was coercive by examining the totality of the circumstances, and in assessing the circumstances, courts must consider any promises or misrepresentations made by the interrogating officers.  Id.  An officer's false promise of leniency renders a suspect's statements involuntary if the promise deprived the individual of his ability to make a rational choice about the courses open to him.  Id.  (finding no coercive police conduct where the defendant made a statement after the detective speculated that the defendant would not receive more than ten years in prison if convicted in federal court).

Here, Defendant received the <u>Miranda</u> warnings from an individual that repeatedly identified himself as a law enforcement officer.  The warnings that Agent Belcher administered apprised Defendant of his right to remain silent, that anything he said could be used against him, and that he had a right to have an attorney present before and during questioning.  Defendant received these warnings after being transported to the Kankakee County Sheriff's Office in a marked patrol car.  Clearly, Defendant understood the adversarial situation, the pitfalls of making statements about the marijuana crop and shotgun, and that he could remain silent.  Defendant, however, proceeded to make incriminating statements to Agent Belcher.

Furthermore, Agent Belcher did make statements that downplayed the significance of the marijuana and shotgun found on the property in St. Anne, Illinois.  However, at no point did Agent Belcher promise anything to Defendant that left Defendant with no choice but to make incriminating statements.  Additionally, Defendant has not demonstrated that he endured physical or mental abuse at the hands of Agent Belcher.  Therefore, the totality of the circumstances in this case demonstrates that

the Defendant voluntarily made incriminating statements to Agent

Belcher.

### III.   <u>CONCLUSION</u>

The Government has presented evidence showing Defendant

knowingly, intelligently, and voluntarily waived his rights under

<u>Miranda</u>.  Further, Agent Belcher's comments about Defendant's

involvement with the shotgun and marijuana crop did not deprive

Defendant of his choice to refrain from making incriminating statements.

Accordingly, Defendant Motion to Suppress (d/e 47) is DENIED.

IT IS SO ORDERED.

ENTER: September 6, 2013

FOR THE COURT:                    <u>s/ Sue E. Myerscough</u>
                                  SUE E. MYERSCOUGH
                                  UNITED STATES DISTRICT JUDGE